
UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>ADAM LEE,<br><br>      Debtor. | Case No. 13-01356<br>Chapter 7 |
| BOON HAN SIA, Individually and as Trustee of the Boon Han Sia Revocable Trust Dated June 3, 2004,<br><br>      Plaintiff,<br><br>  vs.<br><br>ADAM LEE,<br><br>      Defendant. | Adv. Pro. No. 13-90080<br><br><br><br><br><br>Re: Docket No. 59 |

MEMORANDUM OF DECISION ON
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Boon Han Sia alleges that defendant Adam Lee defrauded him when he agreed to buy two condominium units from Mr. Lee's company. Mr. Sia moves for a partial summary judgment determining that his claims are not dischargeable under

sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code. For the following reasons, I will deny the motion.

I. Facts

Mr. Lee owned a company called 1402 Piikoi Street, LLC. Under his control, the company bought an apartment building and converted it into individual condominium units.

As required by Hawaii law, the company issued a Developer's Public Report for a Condominium "to disclose relevant information, including 'material facts,' that are reasonably known to the [company] about the condominium project . . . ."[1] The company represented that it would issue an amended report "if, after the effective date of this report, any changes, either material or pertinent changes, or both, occur regarding the information contained in or omitted from this report."[2] The effective date of the report was March 14, 2008.

On July 22, 2008, the City and County of Honolulu issued a notice of violation stating that the company was illegally doing construction work on the building's lanais without a building permit.[3] The record does not make clear whether this violation was cured. Later, the city issued other notices of violation and imposed

---

[1] Dkt. 60-3 at 2-7.

[2] Id. at 2.

[3] Dkt. 60-3 at 9.

U.S. Bankruptcy Court - Hawaii   #13-90080   Dkt # 101   Filed 06/16/15   Page 2 of 15

fines because the company had renovated some of the units without obtaining required permits or using licensed contractors. These violations have not been cured and the fines have not been paid. Many purchasers of units in the building have alleged that Mr. Lee breached contracts with them and defrauded them.

Mr. Sia and Mr. Lee's company entered into two separate contracts to sell two units–units 303 and 403–in the building.

The first contract, which bears a reference date of January 20, 2009, provides that Mr. Lee's company would sell unit 303 to Mr. Sia's trust for $310,000, payable in cash at closing. On July 6, 2009, Mr. Lee's company and Mr. Sia's trust entered into another contract for the sale of the same unit for $290,000. The two contracts are identical except for the date and the reduction in the purchase price. It is not clear why the parties signed the second contract. Mr. Sia acknowledges signing it but offers no explanation.[4] Mr. Lee says that the first contract was premised on the understanding that his company would renovate unit 303 but that the second contract provided for an "as is" sale, with a corresponding price reduction.[5] But the purchase agreements do not corroborate this assertion; both contracts limit the seller's obligations and warranties in exactly the same way.[6]

---

[4] Dkt. 60-1 at 5.

[5] Dkt. 84 at 13-14.

[6] Compare dkt. 60-3 at 29 with dkt. 60-3 at 120.

U.S. Bankruptcy Court - Hawaii   #13-90080   Dkt # 101   Filed  06/16/15   Page 3 of 15

The sale of unit 303 closed on August 19, 2009. Mr. Sia claims that Mr. Lee never told him, either before he signed the purchase contract or before the sale closed, that purchasers of other units had complained about the condition of their units or that the City has cited and fined Mr. Lee's company for permit and licensing violations.[7] Mr. Lee responds that he and Mr. Sia agreed that unit 303 would not be renovated, so the other owner's complaints about the renovation work in their units and the notices of violation and fines did not pertain to unit 303 or Mr. Sia.[8]

The second contract, which also bears a reference date of January 20, 2009, provides that Mr. Lee's company would sell unit 403 to Mr. Sia's trust for $310,000. Mr. Sia and Mr. Lee both testify that Mr. Sia hoped to obtain a loan to pay for unit 403, but his loan application was rejected, so he decided to pay for the unit with his own funds.[9] Mr. Sia and Mr. Lee also both testify that, after the loan application was rejected, they agreed on an unusual structure for the transaction; Mr. Sia agreed to pay Mr. Lee's company $310,000 upon signing the contract, but Mr. Lee's company would retain title for two years and, at the end of the two-year period, would pay Mr. Sia $58,600 and convey the unit to him. They agreed that, during the two year period, Mr. Lee's company would manage the unit and could mortgage it, and that

---

[7] Dkt. 60-1 at 5-6.

[8] Dkt. 84 at 13-15, 17.

[9] Dkt. 60-1 at 3.

4

U.S. Bankruptcy Court - Hawaii   #13-90080   Dkt # 101   Filed  06/16/15   Page 4 of 15

the rental proceeds of the property would be used to pay the expenses of the unit and service the mortgage. Mr. Sia's interest in unit 403 was not recorded.

The structure of the unit 403 transaction exposed Mr. Sia to serious and obvious risks. He paid the entire purchase price for the unit but left title to the unit in the seller for two full years. He specifically agreed that Mr. Lee could borrow $200,000-210,000 against the unit during the two-year period and invest the proceeds in his other real estate ventures. If Mr. Lee could not repay the loan, the unit could be lost. Mr. Sia's interest in the unit was unrecorded, which meant that other creditors of Mr. Lee and his company could attach the unit and take priority over his interests. Mr. Sia's risk was essentially the same as if he had made an unsecured loan to Mr. Lee and his company.[10] But Mr. Sia understood these risks. He wrote to Mr. Lee:

> In the worst scenario (I apologize in asking this as a foreigner uncertain of what I would be getting), if your company suffers a loss and

---

[10] Mr. Lee contends that he and Mr. Sia agreed to an entirely unrelated third transaction in which Mr. Sia agreed to lend Mr. Lee $310,000. Dkt. 84 at 3-4. He has produced a partial copy of a "Loan Agreement" which describes the transaction as a loan. Dkt. 84-7. The document is incomplete and unsigned, and Mr. Sia does not recall ever signing it. Dkt. 89-1 at 2. Even assuming that there was a complete, signed, and binding loan agreement, the loan and the sale of unit 403 were related, because the "loan" was apparently to be repaid in part by the transfer of unit 403 to Mr. Sia. Stated differently, Mr. Lee does not contend that Mr. Sia was obligated to lend him $310,000 and pay an additional $310,000 for unit 403.

5

[becomes] unable to pay up the principal loan of the 200K-210K, then the transfer of the unit back to me becomes impossible. If your company does well, then I will get the profit of investing the 200-210K and your company will redeem the mortgage and return the unit to me at your costs [sic].[11]

Mr. Lee responded that, "YES IF I DO NOT DO WELL THEN THERE WOULD BE AN OUTSTANDING MORTGAGE ON THE PROPERTY . . . ."[12] Mr. Sia evidently decided that it was worth running these risks in exchange for a potential return of $58,600 over two years on his outlay of $310,000, which is an annual rate of return of about nineteen percent.

Accordingly, on January 20, 2009, Mr. Lee and Mr. Sia signed a document notifying the escrow holder that the original contract had been terminated and instructing escrow to return to Mr. Sia his $5,000 deposit.[13] On or about March 10, 2009, Mr. Sia (through his son) and Mr. Lee signed two "addenda"[14] that confirmed the new terms of the transaction[15] and Mr. Sia paid the $310,000.

In December 2010, Mr. Lee's company took out a mortgage loan against unit

---

[11] Dkt. 60-3 at 70.

[12] Dkt. 60-3 at 76.

[13] Dkt. 84-4 at 2, 84-5 at 2-3.

[14] The first addendum says it "is made part of Purchase Contract" bearing reference date March 10, 2009. The record contains no purchase contract of that date. Most likely, either the parties intended that the addenda would modify the prior contract for unit 403, or the addenda would suffice as a stand-alone agreement. It does not seem necessary to decide which is the case.

[15] Dkt. 60-3 at 77-83.

6

403 in the amount of $220,000.

Unfortunately for Mr. Sia, the "worst scenario" came to pass. Mr. Lee's company initially rented unit 403 to Mr. Sia's ex-wife. The former Mrs. Sia was plagued with water leaks and other problems, so she stopped paying rent and moved out of the unit. When the deadline to transfer title approached (March 11, 2011), Mr. Lee's company could not transfer clear title (because it had mortgaged the unit and could not repay the mortgage). According to Mr. Sia, Mr. Lee told him that he had a "minor problem" with the bank that he would clear up soon.[16] Mr. Sia agreed to extend the deadline for a year, to March 11, 2012, in exchange for a payment of $14,280.[17] They also agreed that Mr. Sia would take over management of the unit, collect all rents, and pay all expenses.[18] Later, Mr. Lee defaulted in paying the mortgage on unit 403, and in November 2013 the unit was lost in a foreclosure.[19] Neither Mr. Lee nor his company has ever transferred unit 403 to Mr. Sia, repaid the principal amount of $310,000, or paid the promised return of $58,600.

Mr. Sia testifies that, if he had known the true facts about the renovation of the units, the lack of building permits and licensed contractors, the fines, and the other

---

[16] Dkt. 60-1 at 7.

[17] Dkt. 60-3 at 168.

[18] Dkt. 60-3 at 177.

[19] Dkt. 60-3 at 172-77.

7

U.S. Bankruptcy Court - Hawaii    #13-90080    Dkt # 101    Filed  06/16/15    Page 7 of 15

owners' complaints (among other things), he would not have entered into the transactions.

II.  Legal Standard

   A.  Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[20] Summary judgment should be granted against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[21] In determining whether there are issues of material fact, the court must draw all reasonable inferences in favor of the nonmoving party.[22]

   B.  Section 523(a)(2)(A)

Debts obtained by "false pretenses, a false representation, or actual fraud . . . " are not discharged in a chapter 7 case.[23] To prevail, the plaintiff must prove five elements:

   (i)   Misrepresentation, fraudulent omission, or the debtor's deceptive

---

[20] Fed. R. Civ. P. 56(c), Fed. R. Bankr. P. 7056.

[21] Huey v. Honeywell, Inc., 82 F.3d 327, 334 (9th Cir. 1996) (quoting Celotex v. Catrett, 477 U.S. 317, 322 (1986)).

[22] Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1090 (9th Cir. 2013).

[23] 11 U.S. C. § 523(a)(2)(A).

8

U.S. Bankruptcy Court - Hawaii   #13-90080   Dkt # 101   Filed  06/16/15   Page 8 of 15

conduct;
(ii) Knowledge of the falsity or deceptiveness of his statement or conduct;
(iii) An intent to deceive;
(iv) Justifiable reliance by the creditor on the debtor's statement or conduct; and
(v) Damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.[24]

C. Section 523(a)(6)

Like debts incurred for fraud, debts incurred for willful and malicious injury are also excepted from a chapter 7 discharge.[25]

An injury is "willful" if the (1) "the debtor had a subjective motive to inflict the injury" or (2) "the debtor believed that injury was substantially certain to occur as a result of his conduct."[26] The touchstone of this standard is that the debtor must have intended to injure the creditor. It is not enough to prove that the debtor acted intentionally and caused an injury.[27]

To prove that the debtor acted maliciously, the creditor must show four elements: "'(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'"[28]

---

[24] Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009).

[25] 11 U.S.C. § 523(a)(6).

[26] In re Jercich, 238 F.3d 1202, 1208 (9th Cir. 2001).

[27] Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).

[28] Jercich, 238 F.3d at 1209 (quoting In re Bammer, 131 F.3d 788, 791 (9th Cir.1997) (en banc)).

9

U.S. Bankruptcy Court - Hawaii   #13-90080  Dkt # 101   Filed  06/16/15   Page 9 of 15

III.  DISCUSSION

   A.   Preclusion

Mr. Sia notes that I entered a partial summary judgment on some issues in favor of certain unit buyers in a separate adversary proceeding. He argues that, based on that ruling, he is entitled to summary judgment on the same issues.

Although he does not state the legal basis for this argument, he presumably wishes to rely on non-mutual offensive issue preclusion. In Hawaii, non-mutual offensive issue preclusion applies when

> (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom [issue preclusion] is asserted was a party or in privity with a party to the prior adjudication.[29]

I will not apply issue preclusion in this case for two reasons. First, there is no final judgment in the related adversary proceeding, so the second element of issue preclusion is not met. Second, Mr. Sia and the plaintiffs in the other proceeding might not be similarly situated, so the issues may not be identical. For example, Mr. Lee argues that Mr. Sia knew the true facts before he signed the relevant contracts, and there is some arguable corroboration for that contention.

---

[29] Exotics Hawaii-Kona, Inc. v. E.I. Dupont De Nemours & Co., 90 P.3d 250, 264 (Haw. 2004) (quoting Bremer v. Weeks, 85 P.3d 150, 160 (2004) ("Thus, even where issue preclusion is utilized offensively, the four requirements must be established by the party asserting preclusion, and the court must consider whether preclusion would contravene public policy or result in manifest injustice.")).

B.  Fraud

Genuine issues of material fact preclude summary judgment on the section 523(a)(2) claims.

1.  Unit 303

Mr. Lee testifies that Mr. Sia agreed that Mr. Lee would not renovate unit 303 and that the price was reduced by $20,000 as a result. If this is true, Mr. Sia could not have justifiably relied on any representations regarding the renovation and could not have been damaged by any such representation.

Although the purchase contracts do not fully corroborate this testimony (the second contract contains the same warranties and disclaimers as the first), Mr. Sia offers no other explanation for the $20,000 price reduction.  One reasonable inference is that Mr. Sia was aware of the renovation issues and negotiated a $20,000 reduction in the purchase price.

The court's role at this stage is to determine whether Mr. Sia entitled to judgment as a matter of law. Drawing all reasonable inferences in favor of Mr. Lee, it is possible to conclude that Mr. Sia intended to purchase an unrenovated unit with no legitimate expectation that it would be renovated. Consequently, there is an issue of material fact, and Mr. Sia is not entitled to summary judgment on this issue.

2.  Unit 403

Mr. Sia has alleged multiple bases for fraud.

11

First, Mr. Sia argues that Mr. Lee made misrepresentations about the renovation of unit 403. Mr. Lee responds that the parties agreed to cancel the first contract and enter into the second "agreement of sale," which contains essentially no warranties about the condition of the unit. Mr. Lee further claims that, by the time he signed the second contract, Mr. Sia was fully informed of all relevant issues. Mr. Lee's testimony is sufficient to create genuine issues of material fact regarding the justifiable reliance element, as well as the requirement for a misrepresentation.

Second, Mr. Sia argues that Mr. Lee defrauded him when Mr. Lee mortgaged unit 403 just a few months before he was supposed to convey clear title to Mr. Sia. But the parties agreed that Mr. Lee could mortgage the unit and did not restrict the timing or terms of such a loan. Mr. Sia has not shown that Mr. Lee owed him a duty to tell him exactly when Mr. Lee exercised his right to mortgage unit 403. Mr. Sia is not entitled to summary judgment on this contention.

Third, Mr. Sia contends that, when the deadline came and Mr. Lee asked for an extension in return for a fee, Mr. Lee misrepresented the reasons why he sought an extension.[30] Mr. Lee told Mr. Sia that there was "a minor problem with the bank" that Mr. Lee said he could solve. Mr. Sia knew that Mr. Lee intended to mortgage the property and that now there was a problem at the bank. A reasonable fact finder

---

[30] Dkt. 60-1 at 7.

U.S. Bankruptcy Court - Hawaii   #13-90080   Dkt # 101   Filed 06/16/15   Page 12 of 15

might decide that Mr. Sia did not justifiably rely on Mr. Lee's characterization of the problem as "minor," or that any mischaracterization damaged Mr. Sia. (After all, by that time Mr. Sia's options were limited. He had already paid Mr. Lee $310,000 and allowed Mr. Lee to mortgage the unit.)

Fourth, Mr. Sia argues that Mr. Lee did not provide a copy of the parties' purchase agreement to Abe Lee Realty, which acted as Mr. Lee's real estate broker, and because he did not put the purchase funds in an escrow account. Mr. Sia argues that Mr. Lee "violated both the law and the Project's governing documents" when he did not give Abe Lee Realty copies of two addenda the parties signed. Mr. Sia relies on Haw. Rev. Stat. § 514B-91, which requires sellers of condominiums to put "[a]ll money paid by purchasers . . . [into a] trust under a written escrow agreement . . . ."[31] The public report, on which he also relies, contains similar language.[32]

This last theory has serious problems. Mr. Lee's failure to provide the parties' purchase agreement to his realtor Abe Lee Realty may have been a breach of contract or a breach of Hawaii statutory law, but Mr. Sia must show that Mr. Lee made a statement or omission or engaged in deceptive conduct on which Mr. Sia relied to his detriment. Mr. Sia knew that the money he paid for unit 403 was not supposed to go into or remain in escrow; Mr. Sia knew and intended that Mr. Lee use that money to

---

[31] Haw. Rev. Stat. § 514B-91.

[32] Dkt. 60-3 at 4.

13

invest in other ventures. This may have been a bad decision, but it is hard to see how it amounts to fraud.

Moreover, the language in the public report and the statute the plaintiff cites does not support his theory that Mr. Lee owed a duty to Mr. Sia to provide a copy of their contract to Mr. Lee's real estate agent. That language states that purchase money must go into an escrow account. It is silent about the duty of a seller to provide a purchase contract to his own real estate agent. Even if Mr. Lee had such a duty, Mr. Sia has not clearly articulated the source of that duty or how he was damaged by an alleged breach of that duty. Mr. Lee's company was the client of Abe Lee Realty; Mr. Sia was not; Abe Lee Realty owed no duty of loyalty or care to Mr. Sia; so providing the contract to Abe Lee Realty would not have protected Mr. Sia.

C. <u>Willful and Malicious Injury</u>

Similar to the fraud claim, issues of material fact still remain. Drawing all inferences in favor of Mr. Lee, a reasonable fact finder could decide that Mr. Lee did not intend to harm Mr. Sia and did not know that his actions were substantially certain to harm Mr. Sia. The record does not rule out the possibility that Mr. Lee was merely negligent or simply breached his agreements with Mr. Sia. For that reason, it would be improper to grant summary judgment now.

There is a reasonable inference that Mr. Lee's mortgaging the property was not wrongful or without just cause. The parties' agreement contemplated that Mr. Lee

U.S. Bankruptcy Court - Hawaii    #13-90080    Dkt # 101    Filed  06/16/15    Page 14 of 15

would mortgage the property at some point within two years after Mr. Sia gave Mr. Lee $310,000. A reasonable fact finder could conclude that doing something a contract specifically authorized is not a wrongful act without just cause.

There is also a reasonable inference that Mr. Lee did not intend to harm Mr. Sia and that he did not know that harm was "substantially certain" to result. The record does not exclude the possibility that, when he mortgaged unit 403, Mr. Lee thought he could get more financing to repay that mortgage in order to convey unit 403 to Mr. Sia.

Finally, the fact that Mr. Lee told Mr. Sia there was a "minor problem" at the bank is only relevant to the parties' extension of the due date for repayment, not the original extension of credit. Even then, that fact would allow a reasonable factfinder to conclude that Mr. Sia did not justifiably rely on the Mr. Lee's statement.

IV. Conclusion

For the foregoing reasons, Mr. Sia's motion is denied.

END OF ORDER

U.S. Bankruptcy Court - Hawaii    #13-90080    Dkt # 101    Filed  06/16/15    Page 15 of 15